MARINE NAT. BANK et al. v. SWIGART.

(Circuit Court of Appeals, Sixth Circuit.   February 3, 1920.)

No. 3343.

1. BANKRUPTCY ⊜‑440—APPEAL AND NOT ERROR PROPER IN REVIEW OF ORDER DENYING ADJUDICATION WITHOUT JURY TRIAL.

Under Bankruptcy Act, § 25a (Comp. St. § 9609), authorizing an appeal as in equity from an order denying an adjudication, an appeal, and not a writ of error, is the proper remedy, though a jury was demanded, where the demand was withdrawn and a hearing had without a jury.

2. BANKRUPTCY ⊜‑467—BOTH LAW AND FACTS REVIEWABLE ON APPEAL FROM ORDER DENYING ADJUDICATION.

On appeal from an order denying an adjudication in bankruptcy on a hearing by the court after withdrawal of a demand for a jury, the whole case is open for review on both the law and the facts.

3. BANKRUPTCY ⊜‑467—FINDING THAT PROPERTY WAS NOT TRANSFERRED WITH INTENT TO DEFRAUD CREDITORS MUST BE ACCEPTED UNLESS EVIDENCE PREPONDERATES AGAINST IT.

On appeal from an order denying an adjudication in bankruptcy, a finding that a transfer of property to corporations organized by the alleged bankrupt was not with intent to hinder, delay, or defraud creditors, must be accepted, unless the evidence decidedly preponderates against it.

4. BANKRUPTCY ⊜‑91(2)—EVIDENCE HELD TO SHOW THAT TRANSFER WAS NOT TO DEFRAUD CREDITORS.

Evidence *held* to support findings that the president of an insolvent jewelry corporation, who transferred farm lands to corporations organized by him, had reason to believe, from negotiations with creditors, that he would not be held on his contingent liability as guarantor of the company's debts, and did not intend to hinder, delay, or defraud his creditors.

5. BANKRUPTCY ⊜‑396(5)—HOMESTEAD INTEREST DOES NOT PASS TO TRUSTEE.

A homestead interest in lands in Ohio, though mortgaged, does not pass to the owner's trustee in bankruptcy.

6. BANKRUPTCY ⊜‑143(8)—WIFE'S DOWER INTEREST DOES NOT PASS TO TRUSTEE.

A wife's dower interest in lands in Ohio, though mortgaged, does not pass to the husband's trustee in bankruptcy.

7. BANKRUPTCY ⊜‑57—TRANSFERS OF EXEMPT INTERESTS WILL NOT SUPPORT CHARGE OF FRAUD NECESSARY TO ACT OF BANKRUPTCY.

Creditors of an alleged bankrupt could not complain of the transfer of a homestead interest of the alleged bankrupt and a dower interest of his wife to corporations organized by him, and the fraudulent intent necessary to render such transfer an act of bankruptcy could not be predicated thereon.

8. FRAUDULENT CONVEYANCES ⊜‑41—TRANSFER TO CORPORATION ORGANIZED BY DEBTOR NOT NECESSARILY FRAUD.

A transfer of property by a debtor to a corporation organized by him is not a fraud merely because an incorporation is employed.

9. FRAUDULENT CONVEYANCES ⊜‑64(1)—ULTIMATE QUESTION IS ONE OF FACT AS TO ACTUAL INTENT.

While, in determining whether a transfer of property was with intent to defraud creditors, the court should consider the nature and necessary result of the transfer, the ultimate question is one of fact as to the actual intent.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

⊜‑For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Proceeding by the Marine National Bank and others to have John Swigart adjudicated a bankrupt. From an order denying an adjudication, petitioners appeal. Affirmed.

Harry C. Cotter, of Toledo, Ohio, for appellants.

E. J. Marshall and R. R. Taylor, both of Toledo, Ohio, for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Appeal from an order refusing to adjudge appellee a bankrupt. After asking a jury trial, appellee waived that right in open court, and hearing was had without a jury.

[1, 2] The question whether appeal or error is the proper remedy is more or less important as affecting the scope of our review, notwithstanding section 4 of chapter 448 of the Act of September 6, 1916 (39 Stat. p. 727 [Comp. St. § 1649a]), forbids dismissal of appeal or writ of error merely because the other remedy should have been taken. In our opinion appeal is the proper remedy. The statute (B. A. § 25a [Comp. St. § 9609]) expressly gives a right of appeal "as in equity" from an order denying an adjudication of bankruptcy. It is only when a jury is had that writ of error is needed to enable review of rulings upon the trial. Loveland on Bankruptcy (4th Ed.) pp. 1439 and 1441; Elliott v. Toeppner, 187 U. S. 327, 23 Sup. Ct. 133, 47 L. Ed. 200. The fact that appellee, after having demanded a jury, withdrew his demand, does not alter the case. The necessity for writ of error relates only to an actual, not a potential, trial by jury. Upon this appeal the whole case is open for review, on both law and facts. Elliott v. Toeppner, supra; Merchants' Bank v. Cole (C. C. A. 6) 149 Fed. 708, 79 C. C. A. 414. The limitation upon the scope of review recognized in Edwards v. La Dow, 230 Fed. 378, 383, 144 C. C. A. 520, as applicable to that suit at law, where waiver of jury was not in writing, has no application to the hearing of this petition for adjudication in bankruptcy, on which a jury is not required, unless specially claimed.

Turning to the merits: Appellee was the principal stockholder in and the president of the John Swigart Company, a wholesale jewelry and optical firm at Toledo. On June 27, 1918, the company, being heavily in debt and embarrassed, transferred its stock and assets to one Hickok, as common-law trustee, so called. A committee of creditors was thereupon organized. Appellee had personally indorsed or guaranteed notes aggregating more than $150,000 for money borrowed from banks by the Jewelry Company, of which about $99,000 remained unpaid after July 1, 1918. The books of the Jewelry Company showed charges against him in upwards of $22,000, which were valid and unpaid, and he had some other debts. The small stockholders in the Jewelry Company (some of whom were also creditors as well as employés) seem to have been dissatisfied with the trustee's conduct of the business, and to desire a slower liquidation, in the hope of saving something for their stock. There seem to have been threats of interference with existing conditions, by injunction or bankruptcy. In these circumstances, the creditors' committee agreed with appellee and the small stockholders upon a compromise method of liquidating

the affairs of the Jewelry Company, embracing appellee's retirement from participation in the business and the continuance therewith of the then force of salesmen and employés, a slower liquidation and the cutting down of overhead expenses, and the appointment of four additional trustees to assist Mr. Hickok, with full authority to liquidate the business and sell the property on such terms as the majority of the trustees should determine. This course it was hoped would realize for creditors a maximum of 70 per cent. of their claims; the amount so realized, whether 70 per cent. or less, "to be regarded as a settlement and compromise figure, in full discharge of all claims and demands which creditors have against the company or against John Swigart personally." Should the 70 per cent. figures be reached, the trustees were to convey back to the company the remaining property "as consideration for the services of the employés" referred to.

On July 27, 1918, the creditors' committee, by letter, informed creditors of the situation, including the proposed method of liquidation; and in submitting the plan for approval or disapproval by creditors in practical effect announced the committee's approval of the plan and advised its acceptance, stating that appellee's property was so badly incumbered that "any equities there may be are doubtful and hard to reach," that the proposed plan would produce more than bankruptcy (stated to be the only alternative), and the committee's conclusion that appellee's indorsements were "substantially worthless." On July 31st, the J. S. Farming Company was incorporated under the Michigan statutes (by appellee, his wife, and one Marguerite Jamieson) with a capital stock of $10,000, represented by 100 shares of $100 each; and appellee and his wife conveyed to that company on the last-named date three parcels of farming land in Michigan, aggregating 478 acres, each parcel subject to a mortgage or mortgages which in all aggregated $57,600 of principal (of which $40,000 was a second mortgage on all three parcels, securing appellee's guaranty of a debt of the Jewelry Company), besides upwards of $1,500 accrued interest and taxes, together with farming tools, machinery, and equipment, wagons, vehicles, and nine horses, upon the farms and belonging to appellee. Mrs. Swigart also conveyed to the Farming Company 43 head of cattle, then upon the land and claimed to be owned by her. In full payment for these conveyances the Farming Company issued to appellee 35 shares of the capital stock, to Mrs. Swigart 60 shares, and to Marguerite Jamieson 5 shares; the latter presumably for qualifying purposes.

On the same 31st of July the J. S. Realty Company was organized under the Ohio statutes by appellee, his wife, Marguerite Jamieson, and two others; also with a capital stock of $10,000, consisting of 100 shares, of the par value of $100 each; and on August 3, 1918, appellee and his wife conveyed to the Realty Company a large number of parcels of real estate in Lucas county, Ohio (two parcels being in Toledo), each of these parcels being incumbered by a mortgage or mortgages aggregating $42,800 of principal. In all the Ohio property Mrs. Swigart had a dower interest, and in one of the Toledo parcels appellee had a homestead interest. In payment for these conveyances

the Realty Company issued to appellee 33 shares of its capital stock, to Mrs. Swigart 60 shares, to Marguerite Jamieson 5 shares, and to each of the other incorporators one share each, these 7 shares being issued presumably for qualifying purposes. In each of these two new corporations Mr. and Mrs. Swigart were elected to the two principal offices. The property so conveyed by appellee to the Farming Company and to the Realty Company was all that appellee then had. A small minority of the Jewelry Company's creditors accepted the proposed settlement.[1] On August 14th petition in bankruptcy was filed against the Jewelry Company, and thereafter it was adjudicated bankrupt.[2] On August 17th appellee and his wife transferred to Messrs. Marshall & Fraser (the counsel under whose supervision the Realty and Farming Companies were formed) all the shares of the capital stock of both the Farming Company and the Realty Company received by them respectively. This transfer was made as security for the payment of the transferees' "reasonable charges and disbursements * * * for services in connection with the affairs of" appellee and the Jewelry Company. On September 14, 1918, petition was filed in the court below for adjudication of appellee as a bankrupt, the sole act of bankruptcy alleged being the conveyances to the Farming Company and the Realty Company before referred to, and the receipt in return therefor of the issued capital stock in those corporations, with alleged intent thereby to hinder, delay, and defraud appellee's creditors.

[3] On the hearing of this petition appellee's insolvency and the statutory amount of debts were conceded for the purposes of the issue; and there being the statutory number of petitioning creditors, the only ultimate question left for decision was whether appellee, in conveying the Michigan farm property and the Toledo and other Ohio real estate to the respective corporations, upon the sole consideration of a portion of the capital stock of those corporations received therefor, intended to hinder, delay, or defraud his creditors. Lansing Boiler, etc., Works v. Ryerson (C. C. A. 6) 128 Fed. 701, 703, 63 C. C. A. 253, 255. The District Judge, after careful consideration of the testimony, as indicated by his written opinion, reached the conclusion that such intention was not proved, but that in fact "the proof tends to preponderate on the other side." The testimony having been taken in open court, we must accept this conclusion of fact unless the evidence decidedly preponderates against it. Carey v. Donohue (C. C. A. 6) 209 Fed. 328, 333, 126 C. C. A. 254. And if this conclusion of fact is accepted the order refusing adjudication must be affirmed.

Apart from the conclusion that previous to the issue of the committee's letter of July 27, 1918, careful examination had been made into the affairs of both appellee and the Jewelry Company, at a largely at-

---

[1] Appellee's attorney testified, without dispute, that favorable responses were received from 25 or 30 creditors of all classes, who assigned their claims, and that "the returns came in a very satisfactory manner, and except for the interference of Mr. Hickok and his determination to force immediate sale the plan of July 27th could and would have been carried through."

[2] The trustee in bankruptcy disposed of all the Jewelry Company's assets in bulk. It is stipulated that that estate will pay creditors approximately 70 cents on the dollar.

tended meeting of that company's bank creditors and by the creditors' committee which was appointed by that meeting, the substantial conclusions reached by the trial judge, so far as seem presently material, are: (a) That when the transfers of the equities were made appellee "had every reason to believe he would not be held upon his contingent liability and was justified in assuming that the creditors would release him personally"; (b) that appellee's explanation that the conveyances of the Michigan and Ohio real estate to the new corporations were made "to conserve the speculative equities in those properties and to make possible the continuance of the dairy business on the Michigan farm" did not appear to be fanciful; and that there appeared nothing reprehensible in appellee's "attempt to save for himself, if possible, through the corporate combination of the tag ends of his properties, what, because of the exigency due to bankruptcy administration, was not salvable for his creditors"; (c) that the "transaction was done openly after a discussion of the purpose with Swigart's creditors"; (d) that there was no satisfactory evidence of the value of Mrs. Swigart's property conveyed to the new corporations, viz. her herd of dairy stock and her dower interest in the Ohio properties, and that it was thus impossible to say that there was "such a disproportion between the interests in the corporations reserved by Swigart and those given to his wife as to itself be a badge of fraud."

Weighing these conclusions by the light of the trial court's opportunity to judge of the credibility of witnesses, we cannot say that the evidence decidedly preponderates against them in material respects. If the testimony of both appellee and his attorney is to be fully credited, the conclusions seem justified. The question of the intent of the conveyances must at the last be referred to appellee's good or bad faith. On this subject the District Judge said:

"Mr. Swigart was on the stand and he exhibited then a state of mind with reference to his affairs as they stood in July and August of last year which compels the conclusion that he was acting at all times in the best of faith with his creditors, and we find no justification in the facts before us for the belief that he was moved at the time by a fraudulent purpose, or even by the despairing debtor's last effort to thwart the lawful exercise of the right of his creditors to immediately proceed against his properties."

This declaration of appellee's apparent credibility is entitled to much consideration.

[4] Referring to conclusion (a): Appellee's attorney testified that he had an understanding with the representatives of the creditors that the latter would accept 70 cents on the dollar and release appellee, and that at the conferences with the creditors' committee three members named, who represented and assumed to speak for all merchandise creditors, repeatedly assured him that the signing of the form of consent by the creditors was a mere matter of form and that such signatures would be furnished "whenever the matter was nearing completion," although it was of course understood that "the matter would have to be submitted to creditors"; and appellee testified that "everybody had agreed to accept 70 per cent., and there was no misunderstanding about that." No member of the creditors' committee

was produced on the trial, and there was no oral testimony disputing that of appellee and his attorney.[3]

As to conclusion (b): The actual value of the equities in real estate transferred to the new corporations is not highly important, except as it bears upon the question of good or bad faith. The burden of showing this value, as an element of alleged bad faith, would seem to be on the petitioning creditors. There was no testimony from either side of the actual value of the lands, except by a witness for petitioning creditors, who (we think naturally) failed to impress the court as having "much qualification." But there was direct testimony on the part of appellee and his attorney, which, if believed, would justify a conclusion that the value of the equities was regarded as small and speculative, and practically valueless to creditors through bankruptcy or other hostile proceeding, although it was regarded as sufficiently promising to justify an attempt to preserve it from such dissipation, and it appears by express testimony that by purchasing more cattle, through the aid of chattel mortgage, and by careful operation the value and income of the equities has been substantially bettered. We do not construe appellee's testimony that in his statement of assets and liabilities he included "the amount available from the farm at $32,000" as attributing to it that value above all encumbrances. The statement seems more naturally to mean that he thought the farm not worth enough to pay more than $32,000 of the $40,000 second mortgage (covering all three parcels of the Michigan lands) given to secure appellee's guaranty of one of the debts due to creditors. Nor do we think that the language of appellee's attorney cited by appellant's counsel necessarily means that creditors and their rights did not enter into the transaction.

[5-7] While there are considerations tending to discredit conclusion (c), there was oral testimony by appellee's attorney which, if believed, would justify the conclusion; and this oral evidence was evidently believed.

Conclusion (d) is amply sustained by the record. Mrs. Swigart's ownership of the cattle must be treated as established, and it is unquestioned that the herd had substantial value. Neither appellee's

---

[3] The letter of the small stockholders to creditors of August 12 (subsequent to the conveyances in question) stated that appellee had turned over all his Jewelry Company stock to a trustee for other stockholders. While the cancellation of Swigart's debit account on the books of the Jewelry Company is not mentioned in the letters to creditors (or in express terms in the testimony) as a feature of the proposed settlement, the natural presumption would be that it was intended—from the considerations: (a) That Swigart's $40,000 second mortgage (nearly double the book charges) secured the Jewelry Company's debt alone, and the Company would thus owe him for whatever was paid thereon; (b) Swigart's undisputed testimony that the offered 70 per cent. was to cover "my liability to any of said creditors under and by virtue of indorsement or otherwise"; (c) the statements in the Committee's letter to creditors already referred to; (d) the statements in the stockholders' letter that Swigart has "nothing worth going after"; and (e) the improbability that Swigart would turn his stock in the Jewelry Company over to the smaller stockholders and still remain liable to the company for the book charges against him.

homestead interest in the Toledo property nor Mrs. Swigart's dower interests in the Ohio lands, although mortgaged, passed to the trustee in bankruptcy. In re Hays (C. C. A. 6) 181 Fed. 674, 678, 104 C. C. A. 656; In re National Grocer Co. (C. C. A. 6) 181 Fed. 33, 104 C. C. A. 47, 30 L. R. A. (N. S.) 982; In re Baker (C. C. A. 6) 182 Fed. 392; 104 C. C. A. 602. Creditors cannot complain of the transfer of those interests to the new corporations, nor can fraudulent intent be predicated upon such transfers. It cannot, from this record, be stated with any degree of confidence that the shares of corporate stock transferred to Mrs. Swigart were of greater value than the three classes of interests just referred to, or that appellee received stock of less value than his equities in the property transferred (as existing at the time), excluding therefrom the three classes of items mentioned.

[8, 9] If, when the transfers were made to the Farm and Realty Companies, respectively, appellee actually and in good faith believed that his release from contingent liability on the debts of the Jewelry Company was as good as given—that its giving was a mere matter of form—it is not a far cry (as the case is presented here) to a conclusion of lack of bad faith in organizing the new corporations and making the transfers complained of. The situation would be in principle more or less analogous to that declared in Merchants' Bank v. Cole, supra, 149 Fed. 708, 79 C. C. A. 414, where a conveyance was held not intended to hinder, delay, or defraud creditors where the grantor, although in fact heavily indebted contingently, supposed such liability had been extinguished. It is true that a court of equity will look through the fiction of a corporation formed for the purpose of accomplishing a fraud under the disguise of the fiction. First Nat. Bank v. Trebein, 59 Ohio St. 316, 52 N. E. 834; Stark Elec. Co. v. McGinty Contracting Co. (C. C. A. 6) 238 Fed. 657, 663, 151 C. C. A. 507. But fraud is not committed merely because an incorporation is employed. The Trebein Case (cited by appellants) is readily distinguishable in its facts from the instant case, in that in the Trebein Case the contingent liability was known to exist at the time the conveyance under consideration was made. It is also true that in determining the question of intent a court should take into consideration the natural and necessary result of the transfer. Bean v. Standard Co. (C. C. A. 6) 131 Fed. 215, 65 C. C. A. 201. But the ultimate question is still always one of fact, viz. actual intent, and "that intent must be established by proof, fraud must be shown, and the good faith of the transaction must be successfully impeached." Merchants' Bank v. Cole, supra, 149 Fed. at page 711, 79 C. C. A. 417; Coder v. Arts, 213 U. S. 223, 242–244, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Lansing, etc., Works v. Ryerson, supra, 128 Fed. at page 703, 63 C. C. A. 253; Johnson, etc., Co. v. Bardsley (C. C. A. 8) 237 Fed. 763–767, 150 C. C. A. 517.

Taking into consideration the entire record, and giving due weight to the absence of testimony material to the issue and as to which petitioning creditors had the burden of proof, as well as the conclusions adopted by the trial judge after seeing and hearing the witnesses, we

cannot say that the evidence decidedly preponderates against the ultimate conclusion reached below.

The order denying adjudication of bankruptcy is accordingly affirmed.